UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

**MICHAEL D. BRAUN,**

**Plaintiff,**

    v,

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant**.

Case No. 1:18-cv-01466-TPK

**OPINION AND ORDER**

## OPINION AND ORDER

    Plaintiff Michael D. Braun filed this action under 42 U.S.C. §405(g) asking this Court to review a final decision of the Commissioner of Social Security.  That final decision, issued by the Appeals Council on October 17, 2018, denied Mr. Braun's applications for disability insurance benefits and for supplemental security income.  Mr. Braun has now moved for judgment on the pleadings (Doc. 17), as has the Commissioner (Doc. 20). For the following reasons, the Court will **GRANT** Plaintiff's motion, **DENY** the Commissioner's motion, and **REMAND** the case to the Commissioner for further proceedings.

### I.  BACKGROUND

    Plaintiff was 42 years old when he filed his applications for benefits on October 16, 2014. Plaintiff alleged that had been disabled since June 15, 2014, and that his disability was primarily due to psychological **impairments**.

    After initial administrative denials of his claim, Plaintiff was afforded the opportunity to appear and testify at an administrative hearing which was held on April 24, 2017.  He did not appear, but his representative did, and a vocational expert, Michele Erbacher, testified at the hearing.  The Administrative Law Judge issued an unfavorable decision on September 25, 2017. He concluded that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2017, and that had not engaged in substantial gainful activity since his alleged onset date.  Next, the ALJ found that Plaintiff suffered from severe impairments including bipolar disorder, generalized anxiety disorder, post traumatic stress disorder, attention deficit hyperactivity disorder, and a history of substance abuse.  According to the ALJ, those impairments limited Plaintiff to understanding, remembering, and carrying out simple and routine instructions and tasks and to working in a low stress environment which involved no supervisory duties, no independent decision-making, no strict production quotas, minimal changes in work routine and processes, only occasional interaction with supervisors, no or only

incidental interaction with coworkers and the general public, and no team or tandem working.

At the hearing, the vocational expert testified that someone of Plaintiff's age and educational history and who had these limitations could perform Plaintiff's past work as a landscape or stores laborer. She also provided numbers for those jobs as they exist in the national economy. The ALJ accepted her testimony and concluded that Plaintiff was not disabled within the meaning of the Social Security Act.

Plaintiff, in his motion for judgment, asserts that the ALJ erred in two ways. First, he argues that the ALJ did not properly evaluate the treating source opinion from Dr. Varallo and also did not obtain pertinent treatment records. Second, he contends that the ALJ did not make proper findings concerning Plaintiff's stress-related limitations. Those arguments will be evaluated based on the following review of the evidence and the applicable law.

## II. THE KEY EVIDENCE

The Court will begin its review of the record by summarizing the testimony at the administrative hearing, which was provided only by the vocational expert, Ms. Erbacher. She identified Plaintiff's past relevant work as tour guide, landscape laborer, and stores laborer. She was then asked about a hypothetical person with Plaintiff's background who was limited to understanding, remembering, and carrying out simple and routine instructions and tasks and to working in a low stress environment which involved no supervisory duties, no independent decision-making, no strict production quotas, minimal changes in work routine and processes, only occasional interaction with supervisors, no or only incidental interaction with coworkers and the general public, and no team or tandem working.. She replied that such a person could do the past relevant jobs of landscape and stores laborer, and she gave numbers for those jobs as they existed in the national economy. However, if the person were absent from work for three days per month or off task for 20% of the workday, that person was not employable. That would also be true if the person could not function even in the low stress work environment defined by the ALJ.

There are not a large number of treatment records. In 2013, Plaintiff was being treated for insomnia and post traumatic stress disorder, reporting, during a mental health assessment, mild anxiety which had worsened since he stopped using alcohol. He also reported a long history of depression and anger as well as a suicide attempt in 2010. Individual counseling was recommended. (Tr. 254-55).

Plaintiff was seen for a diagnostic evaluation on July 24, 2014, shortly after his alleged onset date. He reported a history of bipolar disorder, ADHD, anxiety disorder, and alcohol dependency. At that time, the evaluator, Dr. Wolin, reviewed a report from Plaintiff's counselor, Jennifer Lilleby, who noted that Plaintiff had missed several recent appointments (which was uncharacteristic), had quit his job, and had been staying in bed in an effort to control violent thoughts. Testing revealed a number of conditions including symptoms of both mania and

depression, ADHD, and severe anxiety. He was continued on medication and advised to continue to with his counseling. (Tr. 331-35). Dr. Wolin saw Plaintiff again in a month for medication management, this time noting that Plaintiff had met with his counselor before the session and was depressed, disorganized, and tearful as well as fearful of hurting others. Dr. Wolin observed that Plaintiff made fair eye contact and had a constricted affect as well as illogical thought processes. Dr. Wolin started Plaintiff on a trial of lithium. (Tr. 336-39). In November, things were going well on the medication. By December, the dosage had been increased, but according to his counselor Plaintiff was still angry and isolating and experiencing flashbacks and nightmares. Dr. Wolin judged Plaintiff's response to the lithium to be excellent but noted that he was having some neurologic side effects. Dr. Wolin also noted that Plaintiff's mental status during the examination was normal except for child-like behavior.

Plaintiff continued with counseling and medication management throughout 2015 and 2016. The notes show that he still reported anger in public but he was making good progress and that his presentation was essentially normal at each visit, with some deficiencies in concentration. His GAF was consistently rated at 60. More specifically, in July 2015 Plaintiff reported some transitory hallucinations and increased paranoia, and Dr. Wolin described his moods as still somewhat fluid, consistent with his various diagnoses. (Tr. 487). In 2016, Plaintiff's medication management was temporarily taken over by Dr. Varallo. At their first visit, Dr. Varallo noted that Plaintiff denied mood instability but was having difficulty sleeping and had discontinued Klonopin. Again, his mental status examination was normal, as was the case during his next monthly visit except for a notation of anxious affect. (Tr. 468). By April of 2016, Plaintiff was back seeing Dr. Wolin, who reported that Ms. Lilleby's notes showed that Plaintiff struggled over the winter and at one point went to the hospital for treatment. Dr. Wolin described Plaintiff as being "clearly under substantial stress." (Tr. 464). At that appointment, his behavior was evasive, withdrawn, preoccupied, and defensive and his judgment and concentration were only fair. (Tr. 462). The same was true in June but by August his behavior was described as attentive and his judgment was good. (Tr. 449). In October of 2016, Plaintiff reported that his moods were more stable and that his irritability had diminished, and by December he was described as doing "remarkably well." (Tr. 430, 421). During all of these visits he was directed to continue with his one-on-one counseling.

There are many references in Dr. Wolin's notes to reports from Plaintiff's counselor, but the record appears to contain only one of her progress notes. On April 12, 2017, she provided a status update report indicating that she had been counseling Plaintiff since 2014 and that he was still in active treatment. She stated that he had shown progress over the years but was still struggling with symptoms of PTSD, anxiety, and bipolar disorder, and he demonstrated verbal impulsivity and quick escalation which might interfere with his interaction with others. He was working on achieving a period of stabilization which would last from three to six months. (Tr. 505).

There are three opinions as to residual functional capacity that factored into the ALJ's decision. The first resulted from a psychiatric evaluation done by Dr. Ippolito, a consultative

examiner. She saw Plaintiff on December 19, 2014. Plaintiff reported that he had quit his last job due to problems concentrating and that he suffered from bipolar disorder, ADHD, and PTSD. He told Dr. Ippolito that he was experiencing periods of intense depression and that he was also irritable and aggressive. He became tearful when discussing a history of childhood abuse. Dr. Ippolito observed that Plaintiff's posture was tense and his motor behavior was restless. He showed some difficulty with attention and concentration. Plaintiff lived alone and for the most part was able to perform routine chores. Dr. Ippolito concluded that he could perform simple and even complex tasks with no limitation, could maintain a regular schedule with mild limitations, could relate to others with moderate limitations, and could deal with stress with moderate to marked limitations, all due to his current emotional distress. She believed his prognosis was fair. (Tr. 293-97). A state agency reviewer interpreted these findings as consistent with the ability to perform simple repetitive tasks where there was only brief and superficial contact with others. (Tr. 50).

A questionnaire was also sent to Dr. Wolin. It was completed by Plaintiff's counselor, Ms. Lilleby, and co-signed not by Dr. Wolin, but by Dr. Varallo, who had seen Plaintiff twice for medication management while Dr. Wolin was unavailable. According to Ms. Lilleby, Plaintiff's symptoms included appetite disturbance, sleep disturbance, mood disturbance, emotional lability, difficulty thinking and concentrating, social withdrawal and isolation, decreased energy, manic syndrome, intrusive thoughts, persistent irrational fears and anxiety, and hostility and irritability. She believed he would be absent from work three times per month, that he had only a fair ability to maintain attention for two-hour segments and to maintain attendance, that he had only a fair ability to work with others, and that he had poor or no ability to complete a normal workday and work week without interruption from psychologically-based symptoms. He also had poor or no ability to maintain socially acceptable behavior. (Tr. 434-39).

### III.  STANDARD OF REVIEW

The Court of Appeals for the Second Circuit has stated that, in reviewing a final decision of the Commissioner of Social Security on a disability issue,

> "[i]t is not our function to determine de novo whether [a plaintiff] is disabled." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996). Instead, "we conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir.2009); *see also* 42 U.S.C. § 405(a) (on judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").
>
> Substantial evidence is "more than a mere scintilla." *Moran*, 569 F.3d at 112 (quotation marks omitted). "It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Id*. (quotation marks omitted and emphasis added). But it is still a very deferential standard of review—even more so than the "clearly erroneous" standard. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999). The substantial evidence standard means once an ALJ finds facts, we can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir.1994) (emphasis added and quotation marks omitted); *see also Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir.1994) (using the same standard in the analogous immigration context).

*Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 447–48 (2d Cir. 2012)

## IV.  DISCUSSION

### A.  Treating Source Opinion

Plaintiff's first argument addresses the way in which the ALJ evaluated the treating source opinion. He contends that the ALJ erred by not applying the appropriate factors prescribed by regulatory and case law and therefore did not give that opinion sufficient weight.

When this case was decided, the "treating physician" regulation found at 20 C.F.R. §416.927 was still applicable (it has since been repealed). As this regulation and its companion regulation, 20 C.F.R. §404.1527, have been interpreted,

> "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.' " [*Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir.2008)] at 128 (quoting 20 C.F.R. § 404.1527(c)(2)). There are, of course, circumstances when it is appropriate for an ALJ not to give controlling weight to a treating physician's opinion. *See, e.g., Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir.2004) (per curiam) (holding that "the opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts"). Nevertheless, even when a treating physician's opinion is not given controlling weight, SSA regulations require the ALJ to consider several factors in determining how much weight the opinion should receive. See 20 C.F.R. § 404.1527(c)(2)(I), (2)(ii), (3)–(6). "[T]o override the opinion of the treating physician, we have held that the ALJ must explicitly consider, inter alia: (1) the frequen[c]y, length, nature, and extent of treatment; (2) the amount of medical

evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir.2013) (per curiam). "After considering the above factors, the ALJ must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.' " *Burgess*, 537 F.3d at 129 (alteration in original) (*quoting Halloran*, 362 F.3d at 33). The failure to provide " 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Id*. at 129–30 [citation omitted]. The ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion. *Id*. at 131.

*Greek v. Colvin,* 802 F.3d 370, 375 (2d Cir. 2015).

      The ALJ began his analysis of the opinion evidence concerning Plaintiff's psychological functional capacity by giving great weight to Dr. Ippolito's report. He characterized it as consistent with the evidence as a whole, including Plaintiff's presentation during exams and response to conservative treatment, a history which the ALJ briefly summarized in his decision. (Tr. 21-22). He also gave great weight to the state agency reviewer's opinion dated January 6, 2015, essentially for the same reasons, and also relied on the fact that those two opinions were consistent with each other. *Id*.

      Turning to the treating source opinion, the ALJ gave it only some weight. He noted that Ms. Lilleby, as a counselor, was a non-acceptable medical source (although he acknowledged that Dr. Varallo, who co-signed the opinion, was an acceptable medical source). The ALJ then determined that the opinion was entitled to weight as to its findings that Plaintiff could perform many mental tasks but not as to its conclusion that Plaintiff had greater difficulties coping with stress including the need to miss up to three days of work per month. That, the ALJ said, was "unsupported by the claimant's presentation during exams and ability to attend regularly scheduled appointments" and "inconsistent with the other opinions of record." *Id*.

      The Court notes, first, that the Commissioner seeks to validate the ALJ's decision on the grounds that Dr. Varallo was not really a treating source, having seen Plaintiff only twice for medication management. The ALJ did not include that reasoning in his explanation for rejecting portions of the treating source opinion, and the Court therefore cannot factor it into the analysis. *See Wagner v. Comm'r of Soc. Sec.*, 2020 WL 500177,*5 (W.D.N.Y. Jan. 23, 2020) ("the Commissioner's post-hoc rationalization cannot serve as a substitute for the ALJ's findings...").

      Turning to the reasons actually advanced by the ALJ, the mere fact that a treating source opinion is contradicted by opinions from non-treating or non-examining sources is not, by itself, a valid basis for discounting the views of the treating source. Such opinions may be used only if they themselves are supported by the evidence. *See, e.g., Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) ("[T]he opinions of nonexamining sources [can] override treating sources' opinions provided they are supported by evidence in the record"). It is important to note that

when both of those opinions were rendered, there was very little evidence of record; both were issued well before the majority of Plaintiff's counseling and treatment occurred and could not have taken into account much of the evidence relied on by the ALJ in discounting the treating source opinion. The question then becomes whether this subsequent treatment history bears out the opinions of the non-treating and nonexamining sources, and this is the same question as whether that history undercuts the treating source opinion. While that is the major issue in this case, there is a secondary question concerning how the ALJ independently judged the opinion of Ms. Lilleby. That question is judged under this standard:

> The Commissioner is "free to decide that the opinions of 'other sources'... are entitled to no weight or little weight," but "those decisions should be explained." *Piatt* [*v. Colvin*], 80 F.Supp.3d [480 (W.D.N.Y. 2015)] at 493 (citation omitted). "The amount of weight to give such opinions is based in part on the examining and treatment relationship, length and frequency of the examinations, the extent of relevant evidence given to support the opinion, and consistency with the record as a whole." *Williams v. Colvin*, No. 15-CV-6119-FPG, 2016 WL 1466562, at *4, 2016 U.S. Dist. LEXIS 50448, at *13 (W.D.N.Y. Apr. 14, 2016). An ALJ is not free to disregard a medical opinion solely on the basis that the opinion is from a nonmedical source. *Kelly v. Astrue*, No. 09-CV-1359, 2011 WL 817507, at *5, 2011 U.S. Dist. LEXIS 21009 at *15-16 (N.D.N.Y. Jan. 18, 2011) (ALJ was not free to simply disregard a licensed clinical social worker's assessment on the basis that he was not an acceptable medical source alone), *adopted*, 2011 WL 807398, 2011 U.S. Dist. LEXIS 20965 (N.D.N.Y. Mar. 2, 2011).

*Allen v. Comm'r of Soc. Sec.*, 351 F. Supp. 3d 327, 336 (W.D.N.Y. 2018).

Here, as noted above, the ALJ summarized the mental health records, which consist almost exclusively of records of Dr. Wolin's and Dr. Varallo's medication management appointments, by noting that, when seen approximately monthly, Plaintiff typically exhibited fair eye contact and some deficits in insight, judgment, and concentration, but that his symptoms had improved with lithium, so that by 2015 he was described as stable (or relatively stable) and in 2016 he was said to be doing remarkably well with no major mood instability. The ALJ also recited some of the findings of Ms. Lilleby's 2017 report, although he omitted any reference to her statement that Plaintiff was still trying to achieve a period of stabilization that would last three to six months. He did not refer to or summarize any of the information in the medication management records which was drawn from Ms. Lilleby's reports, however. He then concluded that her opinion, concurred in by Dr. Varallo, was not only inconsistent with the other opinion evidence but "unsupported by the claimant's presentation during exams and ability to attend regularly scheduled appointments...." (Tr. 22).

It is true that there are portions of the record which suggest that Plaintiff had achieved some success with medication and other treatment. But using that progress to severely discount the treating source opinion is not a fair reading of the record as a whole. Plaintiff's presentation

during periodic medication exams does not, for example, speak to the primary issue addressed by the treating source opinion, which is how Plaintiff would stand up under the stress of everyday work. Even Dr. Ippolito had concerns about that ability, describing his impairment in that area as "moderate to marked." (Tr. 296). The stabilization of his mood disorder with medication, which is the most significant factor relied on by the ALJ, also does not directly address his ability to tolerate job stress, especially when coupled with the uncontradicted report from Ms. Lilleby in 2017 that Plaintiff still had not achieved a three- to six-month period of stabilization even after years of counseling and medication management. Additionally, Dr. Varallo was clearly aware of the content of the medication management notes, having completed several of them himself, and he nonetheless concurred in Ms. Lilleby's assessment that Plaintiff had a significant issue with job stress and with maintaining appropriate behavior in a work setting uninterrupted by psychological symptoms. Nor is the ability to attend medical appointments on a periodic basis substantial evidence that a person can deal with the stress of a full-time job. Thus, the record does not support the ALJ's conclusion that there were fatal inconsistencies between the treating source opinion and the body of medical evidence.

This problem is exacerbated by the absence of Ms. Lilleby's notes. As is typical, the "acceptable medical source" - *i.e.* the psychiatrist who performed medication management - did not himself engage in any one-on-one counseling. Here, there is some hint of Ms. Lilleby's observations in the medical management records, but, as noted, the ALJ apparently disregarded them altogether (as well as not mentioning the more severe symptoms noted by Dr. Wolin himself). Ms. Lilleby obviously had the deepest insights into Plaintiff's level of functioning, and it is not possible to tell from this record whether her recorded observations were at odds with her 2016 opinion or whether they fully supported it. Further, the ALJ's treatment of her opinion does not accord with the standard set out in *Allen, supra*, in that the ALJ made no mention of relevant factors such as the existence of a treatment relationship or the extent and frequency of treatment. Instead, the ALJ seemed to view even her 2017 note - which supports a finding of disability - as consistent with the contrary opinions of the state agency reviewer and the consultative examiner, at least to the extent that it was not "vague" on the issue of interaction with others. All in all, the lack of substantial support for the ALJ's decision requires a remand for further evaluation of the opinion evidence, and it would be very useful for the ALJ to obtain the counseling notes as part of that evaluation even if the ALJ did not, as Plaintiff argues, fail in his duty adequately to develop the record by not obtaining those notes.

### B. Stress-Related Limitations

Plaintiff's second argument is that the ALJ's residual functional capacity finding did not adequately account for his stress-related limitations. It is true that an ALJ must accurately account for a claimant's ability or inability to deal with the stress of everyday work when there are mental impairments present which affect that ability. As this Court explained in *Reyes v. Colvin,* 2016 WL 56267, at *5 (W.D.N.Y. Jan. 5, 2016),

> Pursuant to the Commissioner's policy guidance, when determining whether

mentally impaired individuals will be able to adapt to the stress-related demands of the workplace, the ALJ is required to make a thorough, individualized RFC evaluation, focusing on the individual's ability "to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." Social Security Ruling (SSR) 85–15, 1985 WL 56857, at *4, 5 (S.S.A.1985); *Petrie v. Astrue*, 2010 WL 1063836, at *2 (N.D.N.Y. Mar. 19, 2010), *aff'd*, 412 F. App'x 401 (2d Cir. 2011).

*See also Burke v. Berryhill*, 2018 WL 1940260, *4 (Apr. 25, 2018).

The Commissioner points out that here, the ALJ did make an individualized determination concerning Plaintiff's ability to deal with stress, limiting him to working in a low-stress environment with various other restrictions on job stressors, including not working in tandem, not having strict production quotas, not having to make decisions independently, and having little interaction with either the public or others in the workplace. To the extent that Plaintiff's argument is solely that the ALJ failed to make an individualized determination about dealing with stress, the Commissioner appears to have the better of that contention. However, on remand, the ALJ should, after re-evaluating the evidence concerning the severity of Plaintiff's mental impairments, consider whether the record supports the conclusion that those specific limitations are adequate to account for the way in which Plaintiff's impairments affect his ability to deal with not just the stress of everyday working conditions but also the stress of being required to attend work on a daily basis.

## V. CONCLUSION AND ORDER

For the reasons set forth in this Opinion and Order, the Court **GRANT**S Plaintiff's motion for judgment on the pleadings (Doc. 17), **DENIES** the Commissioner's motion (Doc.20), and **REMANDS** the case to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four

**/s/ Terence P. Kemp**
**United States Magistrate Judge**